Thank you, Judge Rader. I appreciate your courtesies. Judge Rader referred to First Order of Business, and indeed it's happy business. I'm honored today to move the admission of my law clerk, Cheryl Trina Burgess, to the Bar of the Court. Ms. Burgess is a member of the Bar in good standing of the highest court of California, and I have knowledge of her credentials and am satisfied that she possesses the necessary qualifications. Those are the sort of magic official words that we have to say in order to have someone. Do we want to accept anybody from California? I think we can. But I would just add that over and above that, she's done an excellent job for me and has been an invaluable member of her chambers, and I'm delighted to move her admissions. She even ran with me in the capital challenge. I think she beat me, by the way. Well, we're pleased to accept this fine, fine addition to our court bar. Please raise your right hand if you swear or affirm that you comport yourself as an attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States of America. I do. Congratulations, and welcome to the Bar of the United States Court of Appeals to the Federal Circuit. We hope we see you for many years.  Our first case is Boer v. The Army. Ms. D'Agostino. You may proceed. May it please the Court. There are six instances of anti-reservist animus in conflicting testimony from management that the Board failed to weigh in determining whether Major Boer met his burden of showing that his status as a reservist was a substantial or motivating factor in his non-selection. Ms. D'Agostino, what evidence of animus or reservist was not considered by the Board? There's two examples of direct evidence involving Mr. Murphy. One that was corroborated by Special Assignment was an instance when Major Boer had to go to General Command Staff College, as was his requirement, and Mr. Murphy was seen ranting in the office about that, accusing Major Boer of shirking his civilian duties for his reservist duties. But that evidence was before the AHA, was it not? It was. But we believe that if you look at all the evidence, there's simply no way that all of the evidence which I'll go through can be outweighed by the evidence set forth by the agency. Essentially... Is there any other evidence that you contend was not considered by the Board? Well, the Board, in essence, hung its hat on Mr. Murphy's statement that he was serving in the military for years and valued the service of reservists. And that's akin to a court finding no discrimination because someone testified that they have African-American neighbors. Those sorts of self-serving statements aren't evidentiary. They're not related to liability. And in this case, the Board took that and outweighed that statement by Mr. Murphy against all the other evidence. Well, that's really what I'm getting at, because it seems to me that all the evidence was before the Board. And normally, the assumption is that the Board weighs and balances all evidence before it. And even though you may disagree with how they weigh that evidence and you may disagree with the outcome, that's not a return to a decision. Well, the Board's decision doesn't reflect that there was some pretty impressive evidence. For example, Mr. Murphy gave Major Bohr lowest scores of any applicant, any of the ten applicants on the Best Qualified list, even lower than a GS-7, even though Major Bohr was sitting in the GS-11 position for, I think, a year and a half at that point and had just received an outstanding rating. And Mr. Murphy's only explanation for that was testimony about two complaints he said he received about Major Bohr. And while the Board called those complaints unrebutted, it did assert that they're uncorroborated. Mr. Murphy was unable to even recall the year, the circumstances, anything about one of those complaints. The other allegedly came from the commanding chief of staff. And Mr. Murphy went on about how important that person is, how he's one step below the general. Yet there was no corroborating evidence, and these complaints were raised for the first time ever, according to Mr. Murphy even, at the hearing. And that was the only explanation that came forward from the agency as to why Major Bohr wasn't selected. There's also Colonel Fitzpatrick's testimony, which lacked any credibility. And the amount of credibility of his testimony, one should be able to conclude that he was attempting to cover something up. He switches story repeatedly. At first, the story was that the two lists from the April vacancy announcement and December vacancy announcement were the same. When confronted with the list, he said, no, it looks like they're not the same. Then he attempted to say that the- I think you're correctly reciting some of the testimony, but there was no allegation that the lieutenant colonel was biased against Mr. Bohr, was there? No, but discriminating against someone and having incredible testimony are two different things. It's very clear from the record that Colonel Fitzpatrick switched his story at least three times. And even though in the end he was a selecting official, we assert that essentially he was a selecting official on paper. It comes from Colonel Fitzpatrick's own testimony that Mr. Murphy was really running the show here. Even though Mr. Murphy was in the hospital, Colonel Fitzpatrick testified that he visited Mr. Murphy. Is that the normal level for Mr. Murphy to be the major player in this hiring process, given that it was his office and so forth? I mean, that in itself, I wouldn't suggest any kind of hostility towards Mr. Bohr. The only reason Colonel Fitzpatrick became the selecting official was because of Mr. Murphy's hospitalization, and it was, of course, normal for him to be the selecting official. However, we assert that Colonel Fitzpatrick's inconsistent statements should have been considered by the court, or essentially a cast call from Mr. Murphy. The case law in other discrimination forms, such as under Title VII, it's very clear that if one person involved in the process, particularly someone in court like the selecting official, has discriminatory animus, that taints the entire process. And that's what we assert happened here. And again, Colonel Fitzpatrick's testimony was so incredible that there would be no reason to not conclude he was not attempting to cover up something. Ms. Dennis, do you know what links all of this alleged animus to the reservist status of Mr. Bohr? Well, there were those two incidents of direct animus by Mr. Murphy. There's also evidence that went unrebutted from others in the office. Why did you, Sarah, come into play? Why does that particular act have relevance here? Because, as the board said, Major Bohr encountered some problems in that office. And his problems all had to do with him being a reservist. Any concern about his schedule, anything that arose, which either his civilian co-workers had a problem with, or Mr. Murphy had a problem with, had to do with a conflict with his reservist duties. And as Colonel Roberts testified, it's true more so today than ever, that there's a special awareness, especially in the Army, as Colonel Roberts explained, that a reservist might very well get called up. And it's not a stretch to see that a supervisor would have a concern about hiring someone in the Reserves, especially in the Army, knowing the implications of that. Ms. Dennis, is Mr. Bohr still in the Reserves? Yes, I believe so. Okay, so he was deactivated in November of 2004 from active duty, correct? Correct. So his status now is, he's a civilian, but still a member of the Reserves. Right. Mr. Bohr currently works for a private employer. Okay, and he was in that same status during the time that he applied for the second announcement, the December 2004 announcement, in response to that. Yes, the December 2004 announcement came about two months after Major Bohr was deactivated. And we assert even the timing of that. Is there anything besides just the timing that suggests that he was not hired because they feared he'd be called up and taken away? Is there anything in the record that really links this to his reservist status as a Major? No, we would argue that it's circumstantial evidence that points to that, which is evidence that under Sheehan should be considered. You know, just like any other discrimination claim, direct evidence is going to be hard to come by. And so circumstantial evidence needs to be considered. Of course, to the extent that we're looking at circumstantial evidence, that probably places the burden on us to defer to the Board even further, doesn't it? The Board held the hearings and had a better chance to assess the circumstances that might lead to a discrimination claim. Well, the Board actually, the administrative judge in her decision, did not give explanations or reasons for her findings. She implied she found, for example, Mr. Murphy's statement about gallowing the service of reservists credible, but didn't provide any explanation or rationale, never referred to any witness's demeanor. And all of the credibility findings were by inference. As we argued in our briefs, we assert that that, one, violates regulations with regard to what an initial decision should contain in terms of explanations for findings. But also, in accordance with case law, those credibility findings should not necessarily be given deference because they're not based on demeanor. They're simply stated as fact. I think the only reason the judge had for finding the statements about gallowing the service of reservists credible was because Mr. Murphy said he served in the military. Those two things don't necessarily, aren't even necessarily relevant to a credibility determination. The judge never even referenced demeanor or even implied a finding based on demeanor or observations of witnesses. With regard to the agency burden, the employer must show the stated reason was not a pretext. That is, that the employer would have taken the action anyway for a valid reason. And unlike in Title VII and under eUSERA, the burden never shifts back. We only get to that issue, though, if we find that, in fact, you established animus, right? Correct. And again, we assert that we established that by Mr. Murphy's animus, by the disparity between the scores that Mr. Murphy gave Major Bohr and his sitting in that position and performance evaluation. I was looking at the panel ranking list on page 140 of the appendix, and there does seem to be one low rank that perhaps is Murphy's, but there's another that's equally low that suggests that perhaps Murphy's low ranking is not the sole assessment that places Major Bohr in the place that he was assessed. The rankings by three of the panel members, including Mr. Murphy and Mr. Ferguson, go wholly unsubstantiated. The only panel member who has any notes or any corroborating evidence for her scores is Ms. McNamara, who I believe rated Major Bohr second next to Mr. Purvis with a score of 15, which is one shy of perfect. In addition, Major Bohr received a score of 105 on the certificate of eligibles, which is the maximum score that he could have received, and Mr. Murphy was perfectly within his right at that time to select Major Bohr off of that list. There's also, getting back to the testimony— But he does rate seventh on this list, right? He does, and— According to the rankers. Right. However, because there was no selection made in April, there can't be a claim based on that. We came back and started over again, I understand. Right. There was obviously no injury to Major Bohr since there was no actual selection and therefore no claim. And in December, there was no evaluation whatsoever of the candidate's merits, and the only, only testimony about any evaluation of the candidates came from Colonel Fitzpatrick saying he checked references, and there's no corroborating evidence. There's no notes suggesting that he checked references or anything of that nature. All the evidence, instead, points to showing that the selection in the end was done by alphabetical order. Colonel Fitzpatrick attempted to testify that that list was done in order of some sort of evaluation of resume. Even the agency's CPAC representative said that was in alphabetical order. And given it's the agency's burden to show that the final action was taken for a valid reason, according to Sheehan, the agency never articulated a valid reason. They never articulated a valid reason for doing a selection in alphabetical order. They never articulated any reason for selecting Mr. Abel. Do you wish to save your rebuttal time? I do. Thank you. Thank you, Mr. Epstein. Mr. Bryan. May it please the Court. The Court should affirm the Board's decision because substantial evidence supports the Administrative Judge's finding that Petitioner failed to meet his initial burden under USERRA, that his status as a military reservist was a motivating or substantial factor for his non-selection from the position of Public Affairs Specialist at Fort Trump. There are a number of reasons, if you look at the record, to support the agency's decision to hire someone else. It is undisputed that Petitioner concedes that Colonel Fitzgerald, who was the selection officer for the December 2004 announcement, did not discriminate against Petitioner. It is undisputed that, furthermore, Colonel Fitzpatrick personally conducted the analysis of the candidates, and Colonel Fitzpatrick was senior to Mr. Murphy. Mr. Murphy was in the hospital at the time that Colonel Fitzpatrick evaluated the candidates. Colonel Fitzpatrick provided underbudgeted testimony that he did not consider reserve status in making his selection. Well, I understood, Mr. Epstein, of the argument that because of certain inconsistencies in the testimony of Colonel Fitzpatrick, that one could draw the conclusion that he was covering up some kind of an action possibly driven by Mr. Murphy. Do you understand that to be the thrust of what she was arguing? Yes, Your Honor, we can respond to that. It seems to be Petitioner's case that because Colonel Fitzpatrick at the hearing testified at one point that he had reviewed, or that there were some candidates who had applied previously in response to the April announcement, who also applied in December, but then later, apparently, I think he got confused at the hearing and said he wasn't sure if some of the candidates had reapplied in December. Well, looking at the record, Your Honor, I think it's clear that Colonel Fitzpatrick was correct when he said that there were four of the ten applicants that are listed on the December referral list, which is Joint Appendix 178, did in fact apply in April. Mr. Davis, Suzanne Stevens, Mr. Boer himself, Mr. Wagstaff, all of these individuals appear on the April 2004 referral list. That referral list is also in the record, Your Honor, and it is, I believe, JA 140. So I think there is some evidence in the record to lend credence to Colonel Fitzpatrick's testimony. But putting that aside, even if we view the facts as Petitioner would have, if Colonel Fitzpatrick did just go down the list in alphabetical order and make his selections based upon where the individual's name fell on the list, that doesn't show discriminatory animus. At most, that shows that Colonel Fitzpatrick perhaps was not as meticulous as he could have been in conducting the evaluation, but it certainly shows by definition that he did not consider reserve or military status in making his evaluation. Petitioner points to the circumstantial evidence, the evaluation process that went into the following April 2004 vacancy announcements  And in particular, Petitioner points to Mr. Boer's ranking as the lowest ranking out of the panel. As the Court noted, there was another panelist, Mr. Craig Ferguson, who gave Petitioner the exact same score as Mr. Murphy did. Furthermore, the rankings that the panel undertook in response to the April 2004 vacancy were based on objective neutral criteria, the skills, knowledge, abilities, point systems, SCAPs. Those SCAPs are listed at JA 187-190, and the SCAPs were tailored toward this position. The ranking members were to take those neutral objective factors and apply them to the resumes that were submitted. If you look at the resumes that were submitted in response to the April 2004 announcement, it's clear just by looking at relevant work experience that Mr. Boer had the least amount of work experience as any other candidate. Mr. Boer's resume at JA 105 states that he had one and a half years of prior work experience in public affairs consisting entirely of his duty assignment to Fort Drum. His prior jobs included working as a manager at a tire store, serving as an adult probation officer, and serving as a salesman of insurance and financial products. If you look to Mr. Purvis, who was ranked number two, Mr. Purvis had nearly 20 years of full-time media relations and public affairs experience working for the Army. His resume is at JA 115-116. Ms. Susanne Stevens, ranked second, had six years of full-time media relations, public affairs, and public affairs experience, including three full-time years as a public affairs specialist. Her resume is found at JA 120. Ms. Anderson. Is there any reason that it struck me as a record that one of the sort of odds when a bunch of these people who were applying for this job and were offered the job then turned it down. Is there any indication in the record why that was? Well, I think there is. I mean, I assume these were people who wanted the job. Then when they got it, they said, no, they didn't. Well, there is, Your Honor. I believe Mr. Purvis accepted a job elsewhere. I think there is testimony in the record there. And he may have actually, I think some of these candidates may have. It may be implied that this job wasn't necessarily their first choice, even though they applied. That's correct, Your Honor. And as you know, the panel, I guess only two, Mr. Purvis, that offer was made. And like I said, I believe he turned it down for just another offer. But again, going through the resumes, we can look at every single one. Ms. Minerva Jo Anderson had six years prior full-time work experience in either public affairs or journalism. Her resume is at J103-104. Jacqueline Butcher had over ten years full-time experience in public affairs or journalism. Which is to make you have been serving in this very position and had merited some kind of compendation for that. That's correct, Your Honor. Was that fully assessed? Well, Your Honor, the administrative judge did take that into account. She specifically found that that was one of the reasons why she found Colonel Fitzpatrick's testimony credible. Because he bore no animus towards Mr. Boer or reservists in general. As evidenced in the fact that he gave Mr. Boer an award for his service. And I think one point that should be made is that that award was given to Mr. Boer as a military officer. He was providing coverage for someone who had to go on leave. And so under those circumstances, of course, I think it's reasonable for the administrative judge to conclude that Colonel Fitzpatrick did not bear any animus toward the petition whatsoever. Indeed, that's a point that the petitioner concedes in this case. The only specific incident that the witnesses that testified for the petitioner at trial could point to involving animus involved petitioners having to miss a public affairs duty assignment one Saturday because they had to attend military training exercises. This point was referenced in the administrative judge's decision. And as is referenced in the decision, Mr. Murphy was upset not so much that Mr. Boer had to attend the training exercises, but rather that petitioner had delegated the task to a soldier who was not scheduled to work that day. Mr. Murphy testified that there was a procedure in the office. If someone couldn't make a media assignment, they had to tell the supervisor who assigned the project and try to get the next person in line for duty that day. That's at Joint Appendix 69 through 70.  Furthermore, as the administrative judge noted, there were other reasons to consider that bolstered Mr. Murphy's credibility. For one, he had served in the military himself for over 25 years. Two, he himself drove Mr. Boer to the personnel office to pick up the application using his own car. And furthermore, even after this alleged incident, Mr. Murphy provided Mr. Boer with a hard copy of the application. And again, one of the witnesses that spoke on Mr. Boer's behalf at the hearing testified that Mr. Murphy was, quote, a great guy to work for and that the soldiers enjoyed working for Mr. Murphy. Furthermore, the record indicates that before and after this event, Mr. Boer had to attend training. I think it was once a weekend every month. There were no problems before or after Mr. Boer even testified that Mr. Murphy was accommodating to him in that regard. Again, Your Honor, even if the facts reviewed as petitioner would have it, there's no proof of discriminatory animus against petitioner. Even if Colonel Fitzpatrick did just go down the 2004 referral list and make offers based upon the order in which the names were listed, that does not show discrimination against reservists. Military status would have played no role whatsoever if that was the method that Colonel Fitzpatrick employed. And indeed, as mentioned earlier, there is evidence in the record to suggest that Colonel Fitzpatrick did, in fact, apply some method. He called supervisors. He spoke to, I think he testified, three supervisors of the candidates. There were other applicants who did apply in April and in December. And again, petitioner concedes that Colonel Fitzpatrick was a selection officer for the December vacancy announcement and that Colonel Fitzpatrick did not discriminate. If there are no further questions, for the reasons stated here today and in our brief, we respectfully request that the Court affirm the Board's decision. Thank you. Thank you, Mr. Bryan. Ms. Decker-Steele, you have about a minute and a half left. The Army argued that four of the ten applicants applied both times. The record is very clear that only two applicants applied both times, Major Bohr and Ms. Stevens. And the work experience of the people who applied in April is irrelevant to this case. None of the other applicants other than Major Bohr and Ms. Stevens, who applied in December, were evaluated on their merits in any context. This job was offered to six people before a final selection was made, including an intern. We ask the Court to consider why the Army went so far out of its way to avoid hiring Major Bohr. And while at one point Mr. Murphy apparently handed Major Bohr a paper copy of the application, Mr. Murphy then waited until December 20th, two months after Major Bohr had left and been deactivated, to reissue the announcement. And then when it was reissued, it was open for four days, the minimum amount of time, closing on Christmas Eve. There's also evidence in this record that the civilian reservist conflict was present in the office. And from the case of Velazquez-Garcia, which was just decided a few months ago in 2007, we learned that this evidence should be taken into account in combination with all the evidence. In this case, even the final explanation from Col. Fitzpatrick, the agency said Col. Fitzpatrick's testimony was undisputed. There was no reason to dispute Col. Fitzpatrick's testimony. It showed that the selection was controlled by Mr. Murphy, it showed the selection was done by alphabetical order, and it showed the selection was done wholly without regard to merit, in other words, not for a valid reason. Thank you, Ms. Davis.